IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

RIDDELL, INC.,

                                                    OPINION and ORDER

                   Plaintiff,

                                                    08-cv-711-bbc

      v.

SCHUTT SPORTS, INC.,

                  Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

In this civil action for monetary, declaratory and injunctive relief, plaintiff Riddell, Inc. has brought claims for patent infringement, false advertising under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) and "trade libel and product disparagement" against defendant Schutt Sports, Inc.  Defendant has brought the usual counterclaims for declaratory judgment of non-infringement, invalidity and inequitable conduct as well as counterclaims for false advertising under §43(a) of the Lanham Act, 15 U.S.C. §1125(a) and the Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100.18.  Now before the court are two motions: plaintiff's motion for partial summary judgment on defendant's counterclaims for false advertising and deceptive trade practices and its motion to strike defendant's expert testimony related to those claims.  (Defendant has filed a motion for

1

partial summary judgment on plaintiff's patent infringement claims and a motion to strike related to those claims.  Those motions will be addressed in a separate opinion.)

I will grant plaintiff's motion for summary judgment because defendant has failed to identify literally false statements or show that it has been harmed by plaintiff's statements. I will deny plaintiff's motion to strike the expert testimony as unnecessary.

Before turning to the motions, a word about procedure is in order.  I have drawn the undisputed facts from the parties' proposed findings of fact and the record.  In doing so, I have disregarded many of the facts proposed by the parties.  In some instances, this is for the customary reasons (the facts are not necessary to resolve the parties' disputes or the evidence cited does not support the fact proposed), but one group of proposed facts is worth mentioning.  In opposition to plaintiff's motion for summary judgment, defendant submits testimony of Garrett Niland, its Vice President of Team Sales.  Niland describes in general terms his "conversations with Prospective Customers and Schutt sales representatives" in which prospective customers described plaintiff's Revolution helmet as a "concussion helmet" and "would not purchase [defendant's] helmets because the Revolution helmet was proven to reduce and prevent concussions."  Niland does not identify any specific conversation with a prospective customer, or even identify any specific customer.  In addition, his reference to customers and sales representatives leaves unclear which statements came directly from customers and which statements were relayed to Niland from

2

sales representatives.  (Only once does Niland says that customers "told [him]".)  Plaintiff contends that these statements are too unspecified and vague to be admissible.  I agree.  Cf. Smith Fiberglass Products, Inc. v. Ameron, Inc., 7 F.3d 1327, 1330-31 (7th Cir. 1993) (evidence of consumer's actual confusion that lacks specifics about a given conversation or its declarant is inadmissible hearsay).

UNDISPUTED FACTS

A.  The Parties

Plaintiff Riddell, Inc. and defendant Schutt Sports, Inc. both manufacture and sell sports equipment, including football helmets and faceguards.  Together, Riddell and Schutt make up 90% of the football helmet marketplace, with Riddell holding a little more of the market share (in dollar sales) than Schutt.

B.  The Concussion Study

1.  Research

Starting in 2002, the University of Pittsburgh Medical Center conducted a study to compare the concussion rates and recovery times for athletes wearing Riddell's Revolution helmet compared to athletes wearing traditional helmets.  Riddell provided a grant to underwrite the study that would include salary support for two leading authors of the study,

3

Micky Collins and Mark R. Lovell.  A third author, Mark Ide, is a Riddell employee.

Three of the study's authors are co-owners of ImPACT, a company that manufactures and distributes computerized neurocognitive testing software.  In 2003, ImPACT and Riddell agreed that ImPACT "would not be selling at any places in conflict with Riddell" and that "any ImPACT sale which is completed through a Riddell initiated contact, Riddell will be paid on."  The authors used ImPACT concussion management software for the study.

The "Research Proposal" for the study included "directional hypotheses."  A directional hypothesis is one that is generated from a theory that would suggest that a relationship between two variables should go one way or the other.  The directional hypotheses provided in the research proposal included that:  (1) "Athletes wearing the Revolution will exhibit significantly fewer incidences of cerebral concussion compared to the [traditional helmet] group"; (2) "Athletes wearing the Revolution will exhibit fewer and shorter-duration-on-field markers of concussion severity as compared to control subjects"; and (3) "Post-concussion neurocognitive dysfunction and post-concussive symptoms will resolve earlier in athletes wearing the Revolution helmet relative to athletes not wearing this helmet."

The study was a "prospective cohort study," not a random study, that focused on a subset of high school players in the Pennsylvania Interscholastic Athletic Association.  For "ethical reasons," the high school students studied were allowed to choose whether to use a

4

Revolution helmet or one of the traditional helmets.

From 2002 to 2004, the study tracked more than 2,000 high school football players, with slightly more than half wearing Riddell's Revolution helmets and slightly fewer wearing "traditional" helmets.  The Revolution helmets supplied in 2002 to study participants were new, but the same helmets were reused in the following years.  The traditional helmets were drawn from the schools' inventories and were not necessarily new.  Traditional and Revolution helmets that were not new were refurbished and recertified each year by a member of the National Athletic Equipment Reconditioners Association using standards established by the National Operating Committee on Standards for Athletic Equipment.

In a 2002 Pilot Data and Report, the authors found that athletes wearing the Revolution helmet and athletes wearing the traditional helmets during the 2002 season had nearly identical concussion rates.  The data gathered in 2003 showed that the difference in the rate of concussion between the groups of athletes wearing the Revolution helmet and the athletes wearing the traditional helmets was not statistically significant, although the difference "approached" statistical significance.

In 2004, an internal study stated that the total number of participants over the three years was 2,207, with 1,173 fitted with the Revolution helmet and 1,034 equipped with traditional helmets.  The internal report showed that 5.29% of the athletes wearing the Revolution helmet had diagnoses of cerebral concussions, while 7.16% of the athletes

5

wearing traditional helmets sustained concussions.  According to the authors, the difference between the groups "approached but did not reach statistical significance."

The final three-year study considered only 2,141 of those participants, with 1,173 fitted with the Revolution and 968 fitted with traditional helmets.  Using these numbers, the concussion rates were 5.3% and 7.6%, respectively, which the authors of the study described as a "statistically significant difference."  According to two authors, the results "demonstrated a trend toward a lowered incidence of concussion" but the "limited size sample precludes a more conclusive statement of findings at this time."

2.  Publication

The study was submitted for publication in Neurosurgery, a journal in the field of neurology.  Prior to publication, the submitted article underwent a peer review process, during which it received several criticisms.  One reviewer observed that "[c]ynics might say that [the three years that were used in the study] was needed to enroll enough subjects so that the results would attain statistical significance."  Another reviewer was "not convinced that significant differences in 'technology' exists between the Revolution and traditional helmet models."  Yet another reviewer noted that "[t]he study has several limitations in its design which may influence the results," including the fact that "[h]elmet selection was neither randomized or controlled," and that "[y]ounger patients tended to use the older

helmet type, and that group may be more susceptible to concussions." The same reviewer also pointed out that "each of the authors has a business relationship with either" ImPACT or Riddell, which the reviewer said created a "substantial conflict of interest."

A separate reviewer criticized the difference in the age of the helmets used, noting that:

> It is well recognized that a new football helmet has a lower [severity index] rating than an older helmet. That is why helmets are recertified after a period of years. We know the Riddell helmets in this study are new but we have no mention of the age of the other helmets. This invalidates any comparison.

Despite these criticisms, the results of the study were published in <u>Neurosurgery</u> in February 2006 in an article titled "Examining Concussion Rates and Return to Play in High School Football Players Wearing Newer Helmet Technology: A Three-Year Prospective Cohort Study." The published study compared the concussion rates of the 1,173 participants fitted with the Revolution helmet (5.3%), with the rates of the 968 participants fitted with traditional helmets (7.6%), concluding that there was a 2.3% decreased absolute risk for sustaining a concussion and a 31% decreased relative risk for athletes wearing the Revolution helmet. The study also compared the concussion rates after subtracting "actual and estimated" athletes with previous concussions "for exploratory purposes." The results were a 3.7% concussion rate for the remaining 1109 players wearing Revolution helmets and a 6.2% rate for the remaining 916 players wearing traditional helmet, about a 41% decreased

relative risk of concussion for players wearing Revolution helmets.

The published article included comments appended to the study.  One commenter stated that it was his opinion that the study "suffers from a serious, if not fatal methodological flaw" raising doubt about the "significance of the data" because the age of the traditional helmets was not known.  Another commenter stated that the study "has several limitations," including the fact that "[h]elmet selection was neither randomized, nor controlled" and that "each of the authors has a business relationship with either" ImPACT or Riddell.

## C.  Riddell's Advertisements

Riddell has relied heavily on the concussion study in their advertisements.  Numerous advertisements include the following phrase or language similar to it:  "Research shows a 31% reduction in concussions in players wearing Riddell Revolution Helmets."  Although the study tested only the Revolution helmets, Riddell used the phrase in many advertisements for other helmets in the Revolution "family," including the "IQ," "IQ HITS," "Youth,"  "Speed" and "Speed Youth" helmets.

Some advertisements included a more complete phrase, to the effect that "research has shown that players wearing the Riddell Revolution football helmet are 31% less likely to suffer a concussion than players wearing traditional football helmets."  Some added that

the study showed a reduced risk of concussion "up to 41%" and others added that the 41% rate was only for players who had not previously suffered a concussion. Most of the advertisements also included a reference to the <u>Neurosurgery</u> article.

In a March 16, 2009 press release, Riddell made the following statement:

The name Riddell is synonymous with football protection. Riddell football helmets and shoulder pads are the equipment that players at the highest levels demand by name. The Riddell Revolution® helmet is the standard against which all football helmets are measured—shown in published research to reduce the risk of concussion by nearly a third. The Revolution Speed football helmet—Riddell's latest breakthrough innovation—is a combination of protection, comfort, and style that is taking the football world by storm. Riddell's proud history has been built on their passionate quest for the next improvement in athlete protection and their drive to advance the state-of-the-art in athletic equipment. Visit www.riddell.com for more information.

Riddell sent out one rush mailer letter stating that "[g]round-breaking research shows that athletes who wear Riddell Revolution Youth helmets were 31% less likely to suffer a concussion than athletes who wore traditional football helmets" and citing the article. Riddell's Director of Marketing, Allison Chonko, later acknowledged that she "found a mistake in the rush mailer letters. Just change it so we don't have false info in our files. I know it's too late to do anything . . ." She modified the rush mailer to state, "Ground-breaking research shows that athletes who wear Riddell Revolution ~~Youth~~ helmets were 31% less likely to suffer a concussion than athletes who wore traditional football helmets."

9

Riddell made other statements in PowerPoint presentations prepared for sales representatives:

- "Revolution IQ HITS is the first helmet system that . . . reduces the chances of a concussion by 31%-41%" and "Revolution Concussion Reduction Technology: shown in a peer review study to reduce the chances of a concussion by 31%."

- IQ HITS, Speed, Revolution IQ, Revolution, Speed Youth, IQ Youth, Revolution Youth and Revolution Little Pro helmets all offered as "exclusive benefit from Riddell" that "reduce[] chances of a concussion by 31%/41%."

- The "Reasons Why Riddell Helmets are Superior to Schutt Helmets" on a helmet by helmet comparison:

  - Revolution Speed vs. Schutt ION 4D: "With RCRT, Speed reduces the chances of concussion by 31%/41%. Documented through a peer reviewed study."

  - Revolution Speed vs. Schutt XP: "With RCRT, Speed reduces the chances of concussion by 31%/41%. XP doesn't stack up."

  - Revolution IQ vs. Schutt XP: "With RCRT, IQ reduces the chances of concussion by 31%/41%. XP doesn't stack up."

  - Revolution vs. Schutt DNA Pro: "With RCRT, Revo reduces the chances of concussion by 31%/41%. Documented through a peer reviewed study."

- Riddell's Revolution Concussion Reduction Technology is its "flagship technology and the basis for every premium helmet in the line" and is "independently proven to reduce the risk of concussion by 31%, and 41% for players who have not previously suffered a concussion."

- "The Revolution Speed Youth helmet is new for 2009. . . .  It features Revolution Concussion Reduction Technology which means when worn by a

10

player[,] it reduces the chances of a concussion by 31%.  Even greater, 41% if the athlete has not suffered a previous concussion."

In a July 2008 PowerPoint presentation prepared for presentation to the National Football League, Riddell described the Revolution helmet as the "[o]nly helmet shown to reduce risk of concussion on the playing field."

In one internal discussion, a sales representative asked "Do you have in PDF or a flyer that states the findings of our Revolution FB Helmet done at the Univ. of Pitts?  I have a customer that is considering the Schutt helmet and I need to email him this info."

D.  Riddell's Revolution "Family" of Helmets

The Revolution "family" of helmets includes the Revolution, the IQ, the IQ HITS, the Speed, the Youth and the Youth Speed.  There are a number of design and material differences between the Revolution and other models in the Revolution family, including different face guard mechanisms, materials used in the outer shell and liner, locking rear pads, mandible designs and padding structures.  The Revolution Youth helmets use an "ABS" material for the shell, whereas adult Revolution helmets use a more durable polycarbonate material.  The IQ has padding with a different shape from that of the Revolution.  The Speed helmet's shell, face guard, mandible designs and liner are different from the Revolution's.  The Speed, the IQ and the IQ HITS helmets have quick-release face

11

guard mechanisms that are different from the Revolution's.

The shell of the Revolution has been modified a number of times since the product's launch in 2002. All high-stress areas have been thickened to reduce the risk of cracking, including the jaw flaps, front vent holes, chinstrap attachment and facemask attachment locations.  Differences in the design of the jaw strap, face masks, lining, shell and other features could affect the ability of a helmet to prevent concussions or reduce the risk of concussion.

### E.  Impact of Advertising

Since the concussion study was published, Riddell has had "great success converting high school and college players into [wearing] helmets with Revolution Concussion Reduction Technology."  The launch of the Revolution allowed Riddell to get a $50 premium for the new helmet, which Riddell attributes to the "technology" of the helmet and the concussion study.

### OPINION

### A.  False Advertising Under Section 43(a)(1)(B) of the Lanham Act

Under § 43(a)(1)(B) of the Lanham Act, a plaintiff must show all of the following:

(1) a false statement of fact by the defendant in a commercial advertisement

> about its own or another's product; (2) the statement actually deceived or has
> the tendency to deceive a substantial segment of its audience; (3) the
> deception is material, in that it is likely to influence the purchasing decision;
> (4) the defendant caused its false statement to enter interstate commerce; and
> (5) the plaintiff has been or is likely to be injured as a result of the false
> statement, either by direct diversion of sales from itself to defendant or by a
> loss of goodwill associated with its products.

Hot Wax, Inc. v. Turtle Wax, Inc., 191 F.3d 813, 819 (7th Cir. 1999).  The required "false

statement" may be either a statement that is "literally false" as a factual matter or a

statement that is "literally true or ambiguous" but "implicitly convey[s] a false impression"

or is "misleading in context, or likely to deceive consumers."  Id. at 820.  However, unless

the statement in question is literally false, the plaintiff also must show actual consumer

confusion, id., which can be established by direct or survey evidence.  Rust Environment &

Infrastructure, Inc. v. Teunissen, 131 F.3d 1210, 1218 (7th Cir. 1997).  In this case,

defendant has not offered any evidence of actual consumer confusion, which means it can

prevail on its § 43(a)(1)(B) claims only if it can show that the statements it challenges are

literally false.


1.  Standard for "establishment claims"

In this case, the challenged advertisements all refer to the results of the concussion

study conducted by researchers at the University of Pittsburgh Medical Center and published

in the February 2006 issue of Neurosurgery.  Such advertisements are often referred to as

13

"establishment claims," presented in the form "tests show x" (or "*establish* x"). <u>BASF Corp.</u> <u>v. Old World Trading Co., Inc.</u>, 41 F.3d 1081, 1090 (7th Cir. 1994). Establishment claims can be shown to be false by showing that the cited test or study "do[es] not prove the proposition." <u>Id.</u> at 1091 (claim that product "met specifications" found to be literally false because no specification tests were performed.)

Some circuits have added that an establishment claim can be literally false even if the cited test or study *does* prove the proposition, if the test was "not sufficiently reliable to permit one to conclude with reasonable certainty that [the test] established the proposition for which" it was cited. <u>Castrol, Inc. v. Quaker State Corp.</u>, 977 F.2d 57, 62-63 (2d Cir. 1992) (citing <u>Procter & Gamble Co. v. Chesebrough-Pond's, Inc.</u>, 747 F.2d 114, 118, 119 (2d Cir. 1984)); <u>Rhone-Poulenc Rorer Pharmaceuticals, Inc. v. Marion Merrell Dow, Inc.</u>, 93 F.3d 511, 514-15 (8th Cir. 1996); <u>Mylan Laboratories, Inc. v. Matkari</u>, 7 F.3d 1130, 1138 (4th Cir. 1993). The Court of Appeals for the Seventh Circuit has not had the opportunity to apply the "sufficiently reliable" rule set forth in <u>Chesebrough-Pond's</u>, although it acknowledged the rule in <u>BASF</u>, 41 F.3d at 1089-90. (In that case, no test or study had been performed, so reliability was not an issue. <u>Id.</u> at 1090.)

The parties both assume the "not sufficiently reliable" test should be applied in this case. I question this assumption. As mentioned above, the test is not binding in this circuit. More important, however, the test leads to a strained reading of the phrase "literally false":

14

a court's determination that a test is "unreliable" leads to a conclusion that a statement in the form "test shows x" is literally false even if the test *really does* show x.  I have not been able to find any case addressing this apparent tension.  Perhaps the rationale supporting the rule is that a statement that seems true on its face can still be literally false by "necessary implication" (another principle the Court of Appeals for the Seventh Circuit has yet to adopt).  Cf. Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co., 290 F.3d 578, 586-87 (3d Cir. 2002).  However, this applies only if the "consumer will unavoidably receive a false message" from the statement.  Id. at 587.  The statement that a "test shows x" (or even that it "proves" x) merely *suggests* that the test is reliable; it does not send an "unavoidable" message that it is.

In my view, if a cited test is unreliable, statements that the "test proves x" are merely deceptive or misleading, not "literally false."  (As explained above, this matters because deceptive or misleading statements require direct or survey evidence of confusion and literally false statements do not.)  Nonetheless, this interpretation is at odds with the conclusion that other courts have reached in deciding to apply the "not sufficiently reliable" test and the parties have not briefed the issue (because both assumed the standard applied). Therefore, for the purpose of this opinion, I will assume that the "not sufficiently reliable" test applies.

Even so, reservations about the viability of the "not sufficiently reliable" test inform

15

my reading of its scope.  What makes a test or study "sufficiently reliable to permit one to conclude with reasonable certainty that [the test] established the proposition for which it was cited"?  <u>Chesebrough-Pond's, Inc.</u>, 747 F.2d at 119.  The parties cite no cases and I have found none that describe the boundaries of "reasonable certainty," but the notion appears to be tied to whether the methods and findings of the cited study are acceptable to the relevant scientific community.  <u>Cf.</u> <u>Bristol-Myers Company</u>, 102 F.T.C. 21, ¶¶ 622, 717 (1983) (for superiority claim requiring support of two well-controlled studies, the Federal Trade Commission examined studies to see whether they followed "the criteria set forth and adhered to by experts in the relevant scientific community").

Describing the test in terms of acceptability to the scientific community moves away from vague and potentially subjective attempts to gauge "reliability."  Courts that have found studies unreliable have pointed to evidence of rejection from the scientific community or similar sources.  For example, in <u>Zeneca, Inc. v. Eli Lilly and Co.</u>, 1999 WL 509471, at *1 (S.D.N.Y. July 19, 1999), the court found Eli Lilly's claims that its drug had been proven to reduce the risk of breast cancer were literally false because the cited study was "not sufficiently reliable."  <u>Id.</u> at *33.  The court noted that "[t]he FDA, as well as numerous other experts in the field of clinical oncology, have reviewed the breast cancer data from the [study] and reached the nearly unanimous conclusion that it does not prove that Evista reduced the incidence of breast cancer."  <u>Id.</u>  The court also found that the study included

16

"critical flaws" such as the fact that the participants were not selected on the basis of breast cancer risks or randomized on the basis of risk factors, and tests such as mammograms and breast physical exams were not performed; the study was not intended to consider the effect of the drug on breast cancer risks, but rather on osteoporosis.  Id.

In Bracco Diagnostics, Inc. v. Amersham Health, Inc., 627 F.Supp.2d 384, 397 (D.N.J. 2009), the defendants had advertised that a study showed its x-ray contrast medium product, Visipaque, to be superior to "low osmolar contrast media" such as plaintiff's product.  The study had concluded that Visipaque's results "were similar to or better than those in studies that included low-osmolar contrast mediums and [prophylactic pharmacologic regimens.]" Id. at 472.  The court found the results of the cited study were unreliable with respect to low-osmolar contrast media other than the media tested despite the fact that the study provided analysis extending the findings to all low osmolar contrast media.  Id. at 474.  The court found it persuasive that the FDA had rejected the study's primary endpoint as not meaningful or reliable (the mean peak change in serum creatinine), which the court read as undermining the defendant's attempt to extend the results of the study to media that had not been tested.  Id.

Finally, in McNeil v. Pfizer, 351 F. Supp. 2d 226, 236-38, 251-52 (S.D.N.Y. 2005), the court held unreliable the conclusions of conclusions that Listerine "was at least as good as" dental floss.  The court pointed to the authors' own statements that the plaque

17

reductions in the flossing groups were "lower than would be expected," which they hypothesized might be a result of "behavioral or technical causes" such as the failure to insure that flossers continued to use the proper techniques.  Id.

In each of these cases, members of the scientific community, a government agency responsible for monitoring the field or the authors themselves identified a flaw in the study that undermined the study's conclusion.  In with these cases, I will frame the question as follows: "are the methods and findings of the cited study acceptable to the relevant scientific community"?  (Rejection by the authors of a study or a regulatory agency is evidence that the study is not acceptable to the relevant scientific community.)

In sum, for the purpose of this opinion, Schutt can establish the literal falsity of Riddell's establishment claims by showing either:  (1) the study cited does not establish what the advertisement says it does or (2) the cited study's methods or findings are not acceptable to the relevant scientific community.

## 2.  Riddell's advertisements

All the advertisements Schutt identifies include an "establishment claim" citing the Neurosurgery study's findings that the risk of sustaining a concussion for Revolution helmet wearers was between 31% and 41% (for those without a previous concussion) less than the risk for traditional helmet wearers.  Schutt's first line of attack is that the study is not

sufficiently reliable.  In the alternative, Schutt contends that the study does not say what the advertisements say it does.

a.  Reliability of the study

Schutt does not attack the reliability of the particular results of the concussion study that Riddell uses (that concussion rates are 31% to 41% lower for Revolution helmet wearers).  Instead, Schutt attacks the reliability of the study as a whole, listing as concerns: (1) conflicts of interest related to Riddell's funding and participation in the study and Riddell's relationship with ImPACT; (2) the non-random sampling method; (3) the lack of information about the age and condition of traditional helmets used; (4) discrepancies between the number of participants in earlier reports and in the final report; (5) the "preliminary" nature of the study; and (6) the fact that the concussion data gathered in the years following the study were not included as part of the study.  (Defendant's criticism of the limited nature of the study, including the geographic and participant age limitations, does not relate to the reliability of the study, but rather whether the study supports broader statements, a matter discussed in a separate section below.)

Schutt's concerns about the study give reasons to doubt the results of the study, but they do not show that the study was unreliable.  In the end, the concerns do not support a finding that the results of the study are not acceptable within the relevant scientific

community.  As a starting point, defendant relies too heavily on criticisms raised during the peer review process.  Reviewers criticized (1) "business relationship[s]" that were said to have created a "substantial conflict of interest"; (2) design "limitations" to the study including the fact that helmet selection was not "randomized or controlled"; (3) the fact that "we have no mention of the age of the [traditional] helmets," which was said to "invalidate[] any comparison" between traditional and Revolution helmets; and (4) the fact that the three-year cutoff of the study may have been simply an attempt to reach "statistical significance."  The study was published over these objections (most of which appeared anew in the comments section appended to the study).

As Schutt points out, "the mere fact of publication of a peer-reviewed article does not prove that the claim in question is true," and even a study that passes peer review may be found to be unreliable.  Zeneca, 1999 WL 509471, at *30; see also Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 593 (1993) (publication of peer-reviewed article does not necessarily correlate with reliability of study).  Nonetheless, the fact that a peer-reviewed article was approved for publication is some evidence that the study is reliable.  Cf. Daubert, 509 U.S. at 594 (fact of publication in a peer-reviewed journal is a "relevant, though not dispositive, consideration in assessing the scientific validity of a particular technique or methodology").  For the same reasons, the fact of publication over peer reviewers' objections is evidence that those objections were not serious enough to make the study unreliable; a

20

party seeking to attack the reliability of a peer-reviewed article should do more than recite objections made by reviewers.  For example, in <u>Zeneca</u>, 1999 WL 509471, at *29-30, the district court rejected a peer-reviewed article, but only after pointing out that the reviewers were not in a position to identify certain flaws in the protocol used in the study, were not given the results of trials showing different results and were not given the comments of the FDA "concerning the inadequacies of the . . . results."

In contrast, Schutt adds nothing to suggest that the reviewers were not in a position to assess the reliability of the study.  Schutt points out that earlier stages of the study considered the concussion results of more traditional helmet wearers than were considered for the final report and additional concussion data was gathered in the years following the published study.  However, Schutt does not offer any evidence that the decision to "drop" some traditional helmet wearers from the final study was not scientifically appropriate or that the concussion data from later years somehow undermined the results of the study. (Schutt accuses Riddell of "cherry-picking" the earlier data, but does not show the new data was less favorable.)

Schutt's expert, Robert Madrigal, lists Schutt's concerns (mentioned above) and concludes that the study is "seriously flawed and cannot reasonably be relied on as support for Riddell's marketing claims."  As an expert, Madrigal's final conclusion is useful only if it is backed by explanation and facts, but he does not provide any.  Madrigal lists the

21

concerns, provides details about each one and agrees with the assessment of some of the critical reviewers.  However, he does not explain why he thinks these "concerns" and "flaws" are serious enough to make the study unreliable.  Should the reviewers' comments have been fatal to the study's publication?  What is it about the combination of listed "concerns" that undermines the study's acceptability to the relevant scientific community?  Would the cited alleged defects in methods (such as sampling concerns, conflict of interest and limited data on age of helmets) be fatal to any study in the relevant field, or is there something about the context that makes them more problematic here than in other contexts?  Madrigal does not address any of these questions, leaving his conclusion unsupported and therefore inadmissible.  Cf. General Electric Co. v. Joiner, 522 U.S. 136, 146  (1997) ("nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert").

In summary, Schutt has not provided any evidence that supports a conclusion that the results or methods of the concussion study are unreliable.  Therefore, it has failed to show literal falsity on this ground.

b.  Differences between what the "study shows" and what the advertisement claims it shows

The more straightforward way of showing "establishment claims" to be literally false is to prove that the study does not establish what the advertisement claims it does.  BASF

22

<u>Corp.</u>, 41 F.3d at 1091.  Schutt contends that Riddell's advertisements fail this test in three ways:  (1) certain advertisements make claims "in connection with" helmets other than the Revolution helmets tested in the study; (2) certain advertisements make claims directed to players other than high school players, the age group tested in the study; and (3) certain advertisements make claims comparing Riddell's helmets to Schutt's high-end helmets, but the study compared Riddell's helmets only with "traditional helmets."

As an initial matter, Schutt glosses over the specific language in the challenged advertisements, focusing instead on the context of the advertisements.  This is a mistake.  To determine literal falsity, the first question is what do the advertisements actually say, and specifically, in the context of an "establishment claim," what do the advertisements say a cited study does or shows?

1) advertisements using study in connection with helmets other than the Revolution

A careful look at the statements Schutt challenges puts them into four groups:

1.    Statements to the effect that "research shows a 31-41% reduction in concussions in players wearing Riddell Revolution helmets";

2.    Statements that the "technology" used in Riddell's Revolution line of helmets has been "shown to reduce the incidence of concussion";

3.    One statement that the "research shows" that wearers of "Riddell Revolution *Youth* helmets" were 31% less likely to suffer a concussion than traditional helmet wearers; and

23

4.    Statements that appear only in PowerPoint presentations to sales force.

The first, third and last groups can be addressed quickly.  The first group is exactly what the study shows, so it cannot be literally false.  Although Schutt points out that this statement is nestled into advertisements for helmets other than the Revolution (but in the same "family"), this context does not make the statement literally false.  At worst, it could make the statement misleading or deceptive.  The third group lies on the other side: the study did not involve Youth helmets, so the statement that it did is literally false (which Riddell acknowledged when it "corrected" the rush mailer letter in its files).  Although the advertisement including the false statement also cited the article, this citation could not erase the literally false statement.  As for the last group of statements, they are not advertisements at all, and Schutt has no evidence that sales force ever made similar statements to members of the public.

The second group of statements is the trickiest.  It is fair to say the study showed that the helmet's technology reduced concussion:  the study identified the Revolution's padding structure and shell shape as what distinguished it from traditional helmets in the study.  What is more uncertain is whether the technology used in the Revolution "family" of helmets has been shown to reduce concussion.  In other words, it is unclear whether the "technology" tested in the Revolution helmet is equally present in all the different helmets

24

in the "family."  As Schutt points out, the different helmets have different design features, including differences in shell, face guard, padding, lining and other features.  Even the current Revolution helmet is different from the original production in that the shell has been thickened in certain areas.

However, this uncertainty is a problem for Schutt, not Riddell.  Schutt has the burden to show that advertisements are literally false, which means it must show that what the advertisements say (that the technology in the Revolution "family" has been shown to reduce concussions) is not true.  In this instance, that means Schutt must show relevant design differences between the Revolution helmets tested and other helmets in the family (and later editions of the Revolution), to establish that the technology in place in these other helmets is not the same as the technology "shown" to reduce concussions.

Schutt has submitted evidence that the helmets are different, but none that suggests the differences are relevant to concussion testing.  What Schutt submits instead are general assertions that design differences to areas like the shell or the face guard *can* change concussion results.  However, this does not explain why the actual design differences in this case would be expected to do so.  Because Schutt has failed to show that the helmets in the Revolution family are different in any relevant way, it cannot show the statements about the "technology" of the family are literally false.

To summarize, Schutt has established literal falsity of only one statement related to

25

the use of the concussion study with other helmets, the statement that "Ground-breaking research shows that athletes who wear Riddell Revolution Youth helmets were 31% less likely to suffer a concussion than athletes who wore traditional football helmets."

2) advertisements using study directed at age groups other than high school students

Schutt does not identify any advertisement stating that the study found reduced concussion rates in groups other than high school players.  However, Schutt argues that the advertisements directed at groups outside high school students are literally false nonetheless because the study was not designed to be applied to those age groups.  Schutt points to McNeil-PPC, Inc., 351 F.Supp.2d at 250-51, for the proposition that an advertisement claim that is "overly broad" is literally false.  However, it is not clear the case establishes that point.

In McNeil, the advertisement claimed that "clinical studies prove that Listerine is as effective as floss against plaque and gingivitis."  Id.  The court concluded that the studies "do not stand for the proposition" set out in the advertisement because the studies were limited to individuals with mild to moderate gingivitis.  Id.  However, the court did not hold that the claim was literally false because it was overly broad; instead, the court reasoned that "consumers who suffer from severe gingivitis or periodontis . . . may be *misled* by the ads into believing that Listerine is just as effective as floss in helping them fight plaque and gingivitis."  Id. at 251 (emphasis added).  Thus, in McNeil, the court acknowledged that an

26

overly broad claim is misleading, which is different from its being literally false.

Schutt also points to <u>Zeneca</u>, 1999 WL 509471, at *29, to support its position that overbroad claims are literally false.  However, that case does not hold as much.  The court points out that the conclusion in the cited study applied to a narrow segment of the population and sales representatives were not limited accordingly ing in their statements, but this point is one of several on a list of problems the court identifies.  <u>Id.</u>  The court adds that the study did not even reach a "definitive[] conclu[sion]" with respect to the segment of the population tested and lists reasons to doubt the reliability of the study generally.  <u>Id.</u>  The better approach is to treat overbroad claims as any other claim:  examine the language of the challenged advertisement to determine whether it is literally false.

In this case, the challenged advertisements state simply that the concussion study showed decreased concussion rates, without providing the limitation that the study applied only to high school students.  Because the study showed decreased concussion rates, the advertisement claims are not literally false.

Although the study was limited to high school students (in a certain region of the country, at that), and may not have been intended to apply outside this group, the lack of a limiting statement does not make the broad statement literally false, not even by "necessary implication."  The absence of limiting language does not require the audience to conclude that there must have been no limitations in the study.  (There are always

27

limitations.)  Moreover, advertisements with such broad statements do not become literally false simply because they are directed to groups other than the segment of the population tested.  The context does not *require* a conclusion that the study must have tested the segment of the population that forms the audience.  At most, such a context *suggests* that the study had a broad study group or that the results can be applied to the audience. This means the advertisements may be misleading, not that they are literally false.

3) advertisements using study to claim superiority over Schutt's high-end helmets

Schutt contends that despite the study's acknowledgment that it did not test Schutt's high-end products (the DNA and the ION), Riddell has been using the study to compare the helmets.  Schutt relies mostly on PowerPoint presentations to sales representatives to establish such improper comparisons.  As explained above, these presentations are not themselves advertisements and do not support a claim that representatives were making false statements.  Schutt contends that such training materials can be used to support a claim for false advertisement, citing <u>Zeneca</u>, 1999 WL 509471, at *8-9.  However, there are important differences between the training materials used in that case and those Schutt relies upon in this case.  In <u>Zeneca</u>, the materials included "verbatims," sales scripts that sales representatives were supposed to use on customers, and notes written by representatives shortly after visits with customers.  <u>Id.</u>  In this case, Schutt points only to PowerPoint

28

presentations with bullet point discussions comparing Schutt and Riddell and internal discussions between Riddell employees.  Schutt does not offer any evidence that the PowerPoint presentations were actually given.  Assuming they were, the bullet points may have guided sales representatives, but they were not "scripts."  None of the internal discussions suggested that any such script was used with customers.

Moreover, neither the presentations nor the internal discussions suggest literally false statements.  For example, a PowerPoint listing "Reasons Why Riddell Helmets are Superior to Schutt Helmets" describes a comparison between the Revolution Speed and the Schutt XP, stating that "With RCRT, Speed reduces the chances of concussion by 31%/41%.  XP doesn't stack up."  The statement does not suggest a sales pitch using literally false statements; that would require language to the effect that the study actually tested Speed and XP helmets or otherwise tested high-end Schutt helmets.  Likewise, the internal discussions suggest only that salespersons used the study as a "tool," not that they made false statements that Schutt high-end helmets had been tested.  Although the presentations and internal discussions may suggest that sales representatives were trained to mislead, they fail to suggest that representatives were trained to make literally false statements.

Aside from these training materials, Schutt challenges advertisements that make "comparative claims" without providing "the point of comparison."  In particular, Schutt attacks unqualified claims that Revolution Helmets reduce concussions 31% (or up to 41%),

29

and claims that "The Riddell Revolution helmet is the standard against which all football helmets are measured—shown in published research to reduce the risk of concussion by nearly a third." According to Schutt, these claims are "necessarily" false (by implication) because they do not include the proper point of comparison:  traditional helmets.

Schutt clumps the two types of claims together, but there are important differences. Assuming the falsity-by-implication principle applies (as explained above, this circuit has yet to adopt it), it requires an examinaton of the specific language of the advertisement to determine whether the "consumer will unavoidably receive a false message" from the advertisement in its entirety.  <u>Novartis</u>, 290 F.3d at 587.  Schutt contends that in either case, Riddell's failure to disclose the point of comparison necessarily implied that Riddell's Revolution helmets were tested against all product offerings, including Schutt's high-end helmets.  Schutt's position seems to be that because Schutt and Riddell are the principal contenders in the market, Riddell's claims of superiority necessarily implicate Schutt's high-end helmets.  This logic skips an important step.

Case law supports Schutt's argument that a claim of superiority may necessarily implicate a principal competitor even when the competitor is not named.  <u>Castrol Inc. v. Pennzoil Co.</u>, 987 F.2d 939, 947, 949 (3d Cir. 1993) (claims that Pennzoil "outperforms any leading motor oil" implied superiority against Castrol); <u>Time Warner Cable, Inc. v. DIRECTV, Inc.</u>, 497 F.3d 144, 154, 162 (2d Cir. 2007) (claim that "[y]ou're just not gonna

30

get the best picture . . . without DIRECTV" necessarily implied superiority over cable in binary market).  However, it is another question whether an unqualified statement necessarily implies a *particular product* of the competitor's.  Schutt does not take issue with Riddell's claims of the superiority of the Revolution helmet over Schutt's *standard* helmets, but rather the claim superiority of its high-end helmets, which were not included in the study.  The question is, do Riddell's unqualified claims that the study showed a reduced risk of concussion necessarily imply that the study included Riddell's high-end products?  The answer is no.

This case stands in contrast with Time Warner, 497 F.3d at 154-58, in which the court found the unqualified statement "settling for cable would be illogical" did imply superiority over a high-end product: cable's high-definition product.  In that case, however, the context of the unqualified statement brought about the implication.  The advertisement opened extolling the "amazing picture quality" of DIRECTV's high definition product and closed "highlighting [DIRECTV's] unbeatable 'HD picture.'"  Id. at 154.  In that context, the advertisement framed the point of comparison, "HD picture," and used the superlative "unbeatable" to shape the understanding of the statement that "settling for cable would be illogical."  In this case, there is no context to frame Riddell's unqualified statements that the study showed a 31% reduction in concussions in a way that includes Schutt's high-end products.  Although perhaps the lack of a qualifier in this setting could mislead, it is not

31

necessarily false.

The analysis is different for the claim that the Revolution helmet is "shown . . . to reduce the risk of concussion by nearly a third" because there is more context.  This advertisement includes a broad statement that the "Revolution helmet is the standard against which all football helmets are measured."  From one angle, this statement suggests that the point of comparison is "all helmets."  However, the language is odd enough to weigh against reading the advertisement that way.  The advertisement does not say that "all helmets" *have been* tested against the Revolution, but rather that it is "the standard" against which they "are measured."  This subtle difference in language opens up the meaning of this statement, allowing a reading that the Revolution is the "gold standard" in helmets because it has been *shown* to prevent concussion, not because it has been shown to prevent concussion better than all other helmets.  In other words, what makes it such a "leader," under one reading, is the simple fact that it has been tested and other high-end helmets have not.

The point of speculating about the potential meaning of this phrase is not to suggest one reading is better than another, only that the message is open enough so that the consumer will not "unavoidably receive a false message."  Novartis, 290 F.3d at 587.  This is fatal to Schutt's claim of literal falsity by necessary implication.

3.  Injury

Schutt has failed to support its claims that Riddell's advertisements are literally false, with one exception:  Riddell's rush mailer stating that the concussion study showed a reduced risk of concussion in Youth helmets.  Even that claim must fail, however, because there is no evidence that Schutt suffered any injury from those advertisements.

Schutt's evidence of injury is scant; it boils down to evidence that Riddell is charging a $50 premium for helmets using the Revolution Concussion Reduction Technology and has "converted" high school and college players.  However, Schutt does not offer any evidence that it has lost any sales or market share, and there is no evidence that the "converted" high school and college players switched from using Schutt's helmets to Riddell's *Youth* helmets (the only helmets mentioned in the false advertisement).  Even if Niland's vague hearsay statements had been considered, they suggested only that customers were seeking Revolution helmets, not the *Youth* helmets.

As Schutt points out, a lack of evidence of injury is not always fatal to a case. Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1145-46 (7th Cir. 1997) (in itself, inability to show actual damages does not preclude recovery under Lanham Act); Badger Meter, Inc. v. Grinnell Corp., 13 F.3d 1145, 1157 (7th Cir. 1994) (Noting that 15 U.S.C. § 1117(a) provides discretionary method for approximating "fair recovery for plaintiff" to provide "such sum as the court shall find to be just, according to the circumstances of the

case," which does not require proof of damages).  In the present case, however, no recovery is warranted.  Schutt has failed to identify any loss of its own or any profit of plaintiffs that might be related to the single false advertisement identified.

Moreover, what made the advertisement false was the suggestion that the helmets were actually tested in the concussion study; had the advertisement simply asserted that the results of the study can be applied to the Youth helmet as part of the same family of helmets, the reader would have gotten the same message and there would have been no false advertisement problem.  (As explained above, Schutt failed to offer any evidence that other helmets in the Revolution "family" have any differences in the "technology" they use that would be relevant to the concussion test results.)  In other words, the falsity is a technical one.  Under these circumstances, with no basis for loss or unjust enrichment in sight, it would be unjust to award any sum to Schutt for the false advertisement.  Moreover, there is no ground for injunctive relief: Riddell has already removed the reference to "Youth" helmets from the rush mailer and there is no suggestion they intend to use that language.

Although Schutt has managed to find one literally false advertisement, none of its Lanham Act claims survive summary judgment.  It is worth noting that this is not because Riddell's advertisements were particularly open and honest, but rather because Schutt tried to take the easiest evidentiary path to success:  literal falsity.  However, at most, the challenged advertisements were misleading or deceptive.

34

### B.  Deceptive Trade Practices under Wis. Stats. § 100.18

Schutt's Deceptive Trade Practices claim fails for two reasons.  First, among other things, Wis. Stat. § 100.18(1) requires the plaintiff to show that the deceptive misrepresentation caused the plaintiff to suffer a "pecuniary loss."  Novell v. Migliaccio, 2008 WI 44, ¶ 49, 309 Wis. 2d 132, 151, 749 N.W.2d 544, 553.  As explained above, Schutt fails to identify any losses it suffered.  Second, as I explained in Grice Engineering v. JG Innovations, Inc., 2010 WL 768971, at *6 (W.D. Wis. Mar. 4, 2010), § 100.18 does not provide a cause of action for misrepresentations made to non-parties; the Act "is not designed to protect product manufacturers from the deceptive acts of their competitors." I stand by that conclusion.  Although Schutt points out that this case is distinct from Grice because "there is no past relationship between Riddell and Schutt" and the deception at issue involves "a purported health benefit," neither of these distinctions matters.  The problem remains the same:  Schutt is not the right entity to complain about Riddell's alleged deception because the deception was to *others*.

Because Schutt has failed to adduce evidence that could support either its Lanham Act or its Deceptive Trade Practices Act claims, I will grant Riddell's motion for summary judgment.  Because Riddell's motion to strike Madrigal's expert report involved testimony related to these claims, I will deny that motion as unnecessary.

ORDER

IT IS ORDERED that

1.  Plaintiff Riddell, Inc.'s motion for summary judgment on defendant Schutt Sports, Inc.'s counterclaims for false advertising and deceptive trade practices, dkt. #140, is GRANTED.

2.  Plaintiff's motion to strike the expert testimony of Robert Madrigal, dkt. #138, is DENIED as unnecessary.

Entered this 14th day of July, 2010.

BY THE COURT:

/s/

BARBARA B. CRABB
District Judge

36